UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>v.<br><br>JUSTIN MICHAEL BOATRIGHT,<br><br>  Defendant. | No. 1:21-CR-070-H |

## MEMORANDUM OPINION AND ORDER

Justin Boatright was stopped by law enforcement in Abilene. A subsequent search of his vehicle uncovered more than half a pound of methamphetamine. He moves to suppress the drugs and any related statements, arguing that officers had no basis for stopping him.

The government counters that Boatright failed to activate his turn signal more than 100 feet before turning—a violation of Texas law that justified stopping him. The government alternatively argues that, thanks to a confidential source, officers had reasonable suspicion to stop Boatright even without the purported turn-signal violation.

The Court rejects the government's first argument. The officer activated his emergency lights before Boatright began to turn, so there is no way of establishing whether Boatright turned where he did because he intended to or because he was being pulled over. The signal-distance requirement is not a "heads I win, tails you lose" tactic that an officer can deploy anytime he attempts to pull someone over.

But the government fares better on its second argument. The confidential source—whom the government identified at the hearing—is reliable enough and gave information specific enough to create a reasonable suspicion that Boatright was engaged in narcotics trafficking. That alone justifies the stop, so Boatright's motion is denied.

1.  **Factual & Procedural History**

    A.  **The Confidential Source**

    In early January 2021, deputies from the Taylor County Sheriff's Office arrested an individual for possessing methamphetamine. This individual—whose identity was revealed by the government in open court despite the Court's invitation for argument on the issue—has a number of prior felony convictions and is a known drug user. The source and the defendant have apparently known each other for some time.

    In an effort to "work off his case," the source began working for law enforcement. The day of his arrest, he provided a list of names to officers, who recognized some of the names on the list as drug dealers; others were new to them. One name not on the list was Boatright's. No arrests were made based on the source's list between his arrest and Boatright's, but law enforcement began investigating the new names.

    Around noon on January 24, the source—who was still facing his possession charges—contacted officers and informed them that a white male named Justin Boatright would be travelling to Abilene with methamphetamine to sell. Boatright, from whom the source had bought drugs in the past, was travelling from the Midland area in a maroon and tan Ford Expedition, the source reported. Officers instructed the source set up a buy with Boatright. The meeting was set near North 6th Street and Westwood Drive.

    B.  **The Traffic Stop**

    Around 4:00 p.m., Officers observed Boatright travelling through Abilene. He did not stop at 6th and Westwood, but he briefly pulled into a nearby parking lot. The officers were concerned that something was amiss, so they instructed the source to change the location of the meeting. Now, the pair were to meet at a location near North 1st Street and North Leggett Street.

As Boatright started to head that way, Sergeant Marvin Patterson radioed to Deputy Chris Rutledge that they needed to stop Boatright. Rutledge was to find some reason for a traffic stop. Rather than simply let the source and Boatright meet, then conduct an arrest based on the anticipated drug sale, officers wanted to "wall off" the source from Boatright's arrest.

Rutledge pulled behind Boatright at the intersection of South 1st Street and South Leggett Drive in Abilene. He began looking for a reason to stop Boatright. As the pair continued north on Leggett through the intersection, they crossed over the railroad tracks that run roughly perpendicular to Leggett. Then, somewhere between the railroad tracks and the entrance to the Burger King parking lot on the west (or left, as the pair travelled) side of Leggett, Boatright turned on his left blinker. Exactly where he did so is the subject of much disagreement between the parties, but, as explained below, the disagreement is immaterial for two reasons. At some point after Boatright activated his blinker, but before he turned left into the Burger King parking lot, Rutledge activated his emergency lights to stop Boatright. The purported basis for the traffic stop was that Boatright failed to signal for more than 100 feet before turning, as Texas law requires. A canine unit was summoned to the stop. The dog alerted, a search was conducted, and 251 grams of methamphetamine was uncovered.

### C. Boatright's Motion

Boatright filed a motion to suppress the methamphetamine seized during the traffic stop and any statements that flowed from that seizure. Dkt. No. 36. He argued that Rutledge had no reasonable suspicion to believe that Boatright had committed the turn-

– 3 –

signal violation that allegedly gave rise to the stop. Dkt. No. 36 at 2–3. Boatright does not challenge the validity of the dog sniff or ensuing search.

The government responded, arguing that Boatright signaled just 58 feet before turning. Dkt. No. 37. In the alternative, the stop was justified by the confidential source's tip. Dkt. No. 37 at 2; 5–6.

Since neither side attached any evidence to its brief, the Court held a hearing on the motion. The government called Sergeant Patterson, who testified about the confidential source, but the government offered no exhibits or evidence. Boatright called Deputy Rutledge and, through him, offered a number of exhibits comprising satellite maps of the location of the stop with various measurements derived from Google Earth. The government did not challenge the accuracy of Google's measurements. Boatright also offered two videos derived from other officer's body-worn cameras. The motion is therefore ripe.

**2.   Governing Law**

The Constitution protects the people against unreasonable searches and seizures. But "the Fourth Amendment permits an officer to initiate a brief investigative traffic stop when he has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Kansas v. Glover*, 140 S. Ct. 1183, 1187 (2020) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)). This reasonable-suspicion standard requires "considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Id.* Indeed, "reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause." *Alabama v. White*, 496 U.S. 325, 330 (1990). An officer need only

"'point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" *Reyes*, 963 F.3d at 488 (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)).

This standard "'takes into account the totality of the circumstances—the whole picture.'" *Glover*, 140 S. Ct. at 1191 (quoting *Navarette v. California*, 572 U.S. 393, 397 (2014)). Thus, the analysis "is necessarily fact-specific, and factors which by themselves may appear innocent, may in the aggregate rise to the level of reasonable suspicion." *Reyes*, 963 F.3d at 488 (quoting *United States v. Ibarra-Sanchez*, 199 F.3d 753, 759 (5th Cir. 1999)). Accordingly, an officer should "consider . . . the events . . . leading up to the search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to a reasonable suspicion." *Id.* (internal quotations omitted).

If a traffic stop is not supported by reasonable suspicion, it is unreasonable. *See United States v. Banuelos-Romero*, 597 F.3d 763, 766 (5th Cir. 2010). And "[e]vidence derived from an unreasonable search or seizure generally must be suppressed." *United States v. Alvarado-Zarza*, 782 F.3d 246, 249 (5th Cir. 2015). "[O]n a motion to suppress, the defendant has the burden of proving, by a preponderance of the evidence, that the evidence in question was obtained in violation of [his] constitutional rights." *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001). But "'if a defendant produces evidence that he was arrested or subject to search without a warrant, the burden shifts to the government to justify the warrantless search.'" *United States v. Roch*, 5 F.3d 894, 897 (5th Cir. 1993) (quoting *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977)).

3.     Analysis

Boatright conceded that if the initial stop was justified, the methamphetamine should not be suppressed.  And the government conceded that the officers did not obtain a warrant.  With those clarifications, the question for the Court becomes straightforward:  Has the government proven by a preponderance of the evidence that the officers had reasonable suspicion when they stopped Boatright?  As explained below, it has.

A.     **Boatright committed no traffic violations that could justify the stop.**

The government contends that Boatright failed to signal more than 100 feet before turning, as required by Texas law.  Dkt. No. 37 at 1.  That violation would justify the traffic stop.  *See Whren v. United States*, 517 U.S. 806, 810 (1996) ("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred.").  The problem for the government is that Deputy Rutledge testified that he activated his emergency lights before Boatright turned.  Boatright cannot, of course, have violated Texas's minimum-signal-distance requirement before turning.  And since Rutledge began the traffic stop before Boatright turned, he did so without reasonable suspicion.  Boatright's driving cannot justify the traffic stop.[1]

---

[1] The government contends that the Supreme Court's decision in *Heien v. North Carolina*, 574 U.S. 54 (2014), means that any mistake by the officers about whether Boatright actually violated Texas's turn-signal law is excusable.  Dkt. No. 37 at 4.  That argument has been roundly rejected by the Fifth Circuit.  *United States v. Onyeri*, 996 F.3d 274, 278–79 (5th Cir. 2021) ("We have said that 'the constitutionality of an officer's stop of a vehicle must stand or fall based on whether the defendant violated Texas law.'  That is, the 'legal justification for the traffic stop must be objectively grounded.'") (quoting *United States v. Cole*, 444 F.3d 688, 689 (5th Cir. 2006) and *United States v. Khanalizadeh*, 493 F.3d 479, 482 (5th Cir. 2007)) (cleaned up).

The government also seemed to argue at the hearing that the stop was justified because, once Deputy Rutledge turned on his emergency lights, Boatright failed to signal for 100 feet before pulling into the Burger King parking lot—that Boatright violated the law while being pulled over, thus justifying his being pulled over.  That argument is meritless.  Aside from putting the cart before the horse, that theory would allow police officers to cruise down streets with their

B.  **The confidential source's tip was sufficiently reliable and detailed to justify the stop.**

The government's fallback argument—that the confidential source's tip gave officers reasonable suspicion to stop Boatright regardless of any traffic infraction, Dkt. No. 37 at 5–6—bears more fruit.

"Reasonable suspicion can be formed by a confidential informant's tip so long as the information is marked by 'indicia of reliability.'" *United States v. Powell*, 732 F.3d 361, 369 (5th Cir. 2013) (quoting *Adams v. Williams*, 407 U.S. 143, 147 (1972)).  The Court looks to "the credibility and reliability of the informant, the specificity of the information contained in the tip or report, the extent to which the information in the tip or report can be verified by officers in the field, and whether the tip or report concerns active or recent activity, or has instead gone stale" when determining whether a tip justifies a traffic stop.  *United States v. Martinez*, 486 F.3d 855, 861 (5th Cir. 2007).  In doing so, the Court asks, in essence, whether the tip is closer to that provided in *Alabama v. White*, 495 U.S. 325 (1990), or more akin to that in *Florida v. J.L.*, 529 U.S. 266 (2000).  *See United States v. McKnight*, 469 F. App'x 349, 354–55 (5th Cir. 2010) (using *White* and *J.L.* as two ends of a spectrum when evaluating whether a tip gave rise to reasonable suspicion).

The source's prior criminal history at once both bolsters and undermines his credibility.  Sergeant Patterson testified that the source had prior felony narcotics convictions and was suspected of dealing methamphetamine himself.[2]  That is a knock

---

emergency lights on just waiting for someone to do exactly what drivers are taught to do—to pull over for emergency vehicles as soon as it is safely possible to do so.  Such a scheme would not be reasonable, as the Fourth Amendment requires.

[2] The officers testified that ounce quantities of methamphetamine could be user-quantities.  *But see also* 21 U.S.C. § 841(b)(1)(B)(viii).

against the source. But the average law-abiding citizen is unlikely to know who sells methamphetamine in her community. Someone who is intimately involved in the narcotics trade is likely to have accurate, actionable information about who else is buying and selling drugs. And the list the source provided included names previously known to law enforcement to be methamphetamine distributors. Having previously given information that, although not new, was verifiable, the source's credibility supports the reliability of his tip about Boatright's travel and activities.

Boatright contends that the source's tip is too vague to support reasonable suspicion: A white male driving through Abilene in a maroon-and-tan Ford Expedition is a far cry from the sort of tip that supports a traffic stop, he argues. Boatright is correct that the tip would be stronger if the informant had given a more specific description of Boatright—something the source plausibly could have done given their relationship. The same can be said of the failure to provide information about weapons, other occupants, or the quantity of methamphetamine Boatright would be carrying.

Nevertheless, the source described the make and color of the vehicle Boatright would be driving. *See McKnight*, 469 F. App'x at 354–55 ("As in *White*, an informant identified McKnight by name and race, and gave a specific description of the vehicle he would be driving, stating that it was a black and brown two-toned, two-wheel drive Chevrolet truck with an extended cab and chrome rims."). And the source was able to arrange a meeting between himself and Boatright. *Id*. at 355 ("The tip also contained predictive information about what McKnight would be doing that day."). Their conversations were not recorded or intercepted, but the source alleged that Boatright would be selling methamphetamine and, when summoned by the source, Boatright showed up. Given that the source had

previously purchased methamphetamine from Boatright, it was reasonable for the officers to assume—even without the pair's communications—that Boatright had agreed to sell the source methamphetamine at the arranged meeting. Finally, all of this happened in a very short period of time: the source contacted officers around noon and the stop was conducted shortly after 4:00 p.m.—the information was not at all stale.

This tip, then, is closer to that in *White* than that in *J.L.* The source, who had proven himself knowledgeable about methamphetamine sales, arranged a meeting and accurately described Boatright and his vehicle. Taken together, the source's familiarity with the Abilene methamphetamine market, his specific description, and his ability to arrange a meeting would give officers reasonable suspicion to stop Boatright when they confirmed that the source's predictions and descriptions were accurate. The source's tip thus checks all of the boxes identified in *Martinez*, 486 F.3d at 861. That is all the Fourth Amendment requires here.

## 4.   Conclusion

Boatright conceded at the hearing that showing a tip does not clear the low bar of reasonable suspicion is an uphill climb. He was right to do so. Because the officers had reasonable suspicion that he was engaged in criminal activity at the time he was stopped, Boatright's motion to suppress (Dkt. No. 36) is denied.

So ordered on May 20, 2022.

                                                      _____
                                                  JAMES WESLEY HENDRIX
                                                  UNITED STATES DISTRICT JUDGE